[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 8, 2006
THOMAS K. KAHN
CLERK

_____

No. 06-10095
Non-Argument Calendar

_____

BIA No. A79-415-359

FRAN DREJAJ,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(August 8, 2006)**

Before TJOFLAT, CARNES and HULL, Circuit Judges.

PER CURIAM:

Fran Drejaj petitions for review of the Board of Immigration Appeals' order adopting and affirming the immigration judge's denial of his claims for asylum and withholding of removal under the Immigration and Nationality Act ("INA") and for relief under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"). After review, we deny the petition.

## I. BACKGROUND

### A.    Drejaj's Arrival

On August 19, 2001, Drejaj, a native and citizen of Albania, arrived in the United States at the Miami International Airport seeking admission under the visa waiver pilot program.[1] Drejaj presented a false Slovenian passport.

Upon his arrival, Drejaj was interviewed by an Immigration and Naturalization Service ("INS")[2] officer. In a sworn statement, Drejaj stated that he was a citizen of Albania and that the purpose of his entry was to apply for political asylum and to rejoin his wife and children who were living in Detroit and awaiting

---

[1]The visa waiver pilot program authorizes the Attorney General to waive the entry document requirements for qualifying nationals of certain countries who are seeking temporary admission to the United States as nonimmigrant visitors. See INA § 217(a), 8 U.S.C. § 1187(a); 8 C.F.R. §§ 217 et seq.

[2]Under the Homeland Security Act of 2002 ("HSA"), the INS was abolished and its functions transferred to the newly-created Department of Homeland Security. See Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1200 n.1 (11th Cir. 2005). Because the proceedings against Drejaj were initiated prior to enactment of the HSA, we refer to the agency as the INS.

their own asylum hearing. Drejaj indicated that he had never been arrested and stated that he feared for his family's safety in Albania because of "a mafia group or criminals on the street" who would kill a person if he did not give them money. When asked if he would like to add anything else, Drejaj replied, "I would like to ask political asylum." The INS then initiated immigration proceedings by filing a Notice of Referral to an immigration judge ("IJ").

## B.    Asylum Application

Drejaj filed an application for asylum, withholding of removal, and relief under the CAT, claiming persecution on account of his political opinion. Drejaj's application stated that he feared for his life if he returned to Albania because he had been threatened by members of the Socialist Party ("SP") – the former Communist Party – due to his membership in the "Democratic Voting Commission." Further, on October 1, 2000, the police came and beat up approximately twelve to thirteen people who belonged to the "Commission," including Drejaj. They were beaten because the police wanted the SP to win and Drejaj and the other victims belonged to the Democratic Party ("DP"). The police beat Drejaj with rubber sticks, and he had to be treated at a local hospital for bruises on his back, arms, and shoulders.

Drejaj had been a member of the DP from 1990 until the time he left Albania in 2001. Drejaj also noted that his wife's father was jailed in Albania for eight

years for "political reasons," that he feared persecution and torture upon being returned to Albania, and that he could be imprisoned or killed.

To supplement his application, Drejaj submitted a letter from the secretary of the Political Anticommunist Association ("PAA"), stating that Drejaj was a member of the PAA and had participated in anticommunist demonstrations as early as 1990. The letter detailed the Communist state security forces' mistreatment of Drejaj in 1991 and 1998 and stated that Drejaj's family had their land seized and "were denied the right of education, job, and shelter." In addition, Drejaj submitted a letter from the Chairman for District Kelmend, stating that Drejaj was a resident of a village located in the district and that his family had been persecuted by the Communists. The letter stated that Drejaj had been one of the earliest activists in the democratic movement, and that when the SP came to power in 1997, he was a target of the police on account of his political activities. The letter further stated that Drejaj had his house searched several times and that, as a result of police mistreatment and threats, he was forced to leave the country.

Drejaj also submitted the U.S. State Department's Country Reports on Human Rights Practices for Albania for the years 2000, 2002 and 2003. According to the 2003 Country Report: (1) Albania is a republic with a multiparty parliament headed by a prime minister; (2) the SP and DP held most of the seats in Parliament; (3) in October 2003, local elections were held throughout the country, which were

4

judged to be an improvement over previous elections, with only a few isolated incidents of irregularities and violence; (4) although there were improvements, the government's human rights record remained poor in some areas; (5) while the police occasionally arbitrarily arrested and detained individuals as well as reportedly used excessive force against protesters, there were no political killings, nor were there any reports of politically motivated disappearances; (6) the police sometimes used threats, violence, and torture to extract confessions; and (7) although the law required organizers to notify the police about gatherings in public places and the police could refuse to permit such gathering for security and traffic reasons, there were no reports of such denials being made arbitrarily, and the government generally respected the right of association. The other Country Reports, as well as other documentation on Albania that Drejaj submitted, were generally consistent with the 2003 Report.

The 2001 Profile of Asylum Claims and Country Conditions for Albania ("Asylum Profile"), submitted by Drejaj, stated that most claims based on political opinion are because of mistreatment of the applicants during the communist regime between 1945 and 1990, and that "[w]ith the socialist party currently leading a coalition government, it is highly unlikely in today's circumstances that many applicants will have credible claims to political persecution." The Asylum Profile further stated that most asylum claims

5

are generally amplified by the assertion that a reconstituted communist regime has come to power. Claims relying on this premise are contradicted by virtually all state actions, and those who truly were persecuted by the communists often resent the comparison. Both major parties trace their roots to the communist regime and both repudiate it thoroughly. . . . There is virtually no evidence that individuals are targeted for mistreatment on political grounds.

Finally, the Asylum Profile advised that "[a]djudicators should explore all the motivations an applicant might have for requesting asylum, including family members already present in the United States . . . . It bears repeating the vast majority of asylum claims involve economic, not political considerations."

## C. The Asylum Hearing

At the asylum hearing, Drejaj testified that the Albanian government began persecuting his family in 1973, denying them basic human rights because his cousins had fled to Yugoslavia. Drejaj had been a member of the Anti-Communist Society of Albania since 1980, joined the DP on June 13, 2000, and was a member of the DP and the Electoral Commission. As a member of the Electoral Commission, his job was to prevent voting fraud.

During the October 2000 elections, approximately seven or eight policemen came to Drejaj's voting station, took the ballots, and beat up twelve or thirteen individuals, including him. The police beat them because the police wanted to stay in power. Of the twelve or thirteen individuals present, seven or eight were members of the Electoral Commission, while the rest were observers, but the

6

police beat everybody. Drejaj stated that the commission members and observers belonged to various parties, but that the police mostly beat up only the DP observers.

At this point in the testimony, Drejaj's counsel stated that she thought that everyone had been beaten, to which Drejaj replied that, while only seven or eight individuals were DP members, all twelve or thirteen people present were beaten. The IJ then inquired whether it was correct that the police had beaten people from the other parties as well as the DP. Drejaj replied, "No. They beat only the observers of the Democratic Party. All 12 people were with the Democratic Party. Seven or eight were part of the commission, and the others were – had only a simpler role. They were just observers." Then, the following exchange occurred between the IJ and Drejaj:

IJ: Before you seemed to indicate that everybody who was present was beaten, and now you're stating that only members of your party were beaten. So we're trying to nail down exactly who was beaten.

Drejaj: Only the members of the Democratic Party were beaten.

IJ: Didn't you say earlier that everybody was beaten?

Drejaj: Yes, I said all, but I meant all Democratic Party, observers and members of the commission.

IJ: Were members of the commission of other parties?

7

Drejaj:     Yes, there were members of the other parties – of the commission from the other parties, Republican Party, Socialist Party, et cetera.

IJ:         Okay. Were the members of the commission who were not of the Democratic Party – were they beaten as well?

Drejaj:     No, they were not. The main goal was to beat up all the members of the Democratic Party.

Drejaj testified that the people who beat him up belonged to the SP. He sought medical treatment for the bruises covering his body resulting from the police beatings, was treated at a local hospital for four to five hours, and received an injection, pills, and ointment for his wounds.

Drejaj further testified that he was involved in two other incidents. First, Drejaj participated in a riot on June 24, 2001, protesting the SP stealing the election and its use of violence against its opponents. There, the police beat him up and threatened to kill him if he did not back down and go home. He was treated at a local clinic for a wound to his jaw. Second, on July 5, 2001, the police came to Drejaj's home, arrested him and his cousin, and beat them up because the police suspected them of planning a future demonstration. Drejaj initially testified that at the time of the July 5, 2001, incident, he was living with his brother, mother, wife, and children, but he then clarified that his wife was in the United States at the time. After being arrested, Drejaj was detained for several hours in a small cell and beaten by the police, who told him that he had to quit being a member of the DP.

8

Upon being released, he obtained treatment in the form of pain medication and decided to leave Albania because he felt that his life was in danger.

Drejaj also testified that he was involved in riots against the Communists in April 1991, during which he was beaten by the police and many people were killed and seriously wounded. Drejaj's wife and children were threatened because of his political involvement, and his wife's father was imprisoned for eight years. Drejaj claimed that he had an uncle who had been imprisoned for four years for political reasons. Drejaj stated that if forced to return to Albania, he would be killed.

On cross-examination, Drejaj acknowledged that he had not made any arrangements to have his cousin — with whom he was arrested in July 2001, but who was now living in New York — testify at the hearing or provide an affidavit. Drejaj testified that on October 1, 2000 — the same day he was beaten by police at the polling station — his wife and children boarded a flight that eventually took them to the United States. Drejaj explained that he and his wife had planned the trip in advance and that he wanted to travel with his family, but decided to stay because he wanted to participate in the election. Drejaj testified that they wanted to leave Albania because they were "unsecured"; acknowledged that at the time of his family's departure from Albania on October 1, 2000, he had planned to leave Albania and rejoin his family; and stated that he wanted to leave Albania even before October 2000 because he had been beaten and tortured. Drejaj

9

acknowledged that he had no medical records documenting the treatments he received.

The government also asked Drejaj why he had omitted his July 2001 arrest on his written asylum application. Drejaj replied that he had omitted it "perhaps because it was not a major demonstration . . . ." When asked again why he had not included this incident, given his testimony that he had been detained overnight and beaten by the police, Drejaj replied that there was "no particular reason" he had left it out.

Finally, the government questioned Drejaj regarding the sworn statement he gave to the INS officer upon his arrival into the United States. Drejaj acknowledged that he told the INS officer he was entering the country because he feared that his family would be killed by the mafia or criminals if he did not give them money. The government then asked Drejaj whether it was true that he did not tell the INS officer anything about his political problems, to which he replied, "It is true, because I simply asked for political asylum and nothing more." The government continued its line of questioning, asking whether it was correct that he did not inform the INS officer about the DP or any of his problems with the police, to which Drejaj replied, "I didn't know I was supposed to tell everything that happened to me when I met the Immigration Officer, and that's why I didn't say it to him."

10

**D.    The IJ's Decision**

In an oral decision, the IJ denied Drejaj's application for asylum and withholding of removal under the INA and his application for relief under the CAT. The IJ found Drejaj not credible, focusing on three discrepancies. First, Drejaj testified on direct examination that he was arrested along with his cousin on July 5, 2001, but he failed to include the arrest in his written asylum application and explained that he left out the arrest for "no particular reason." Second, in his initial INS interview, Drejaj stated that he was entering the United States because he feared for his family on account of a mafia group of criminals who would kill a person if he did not give them money. Only when the INS officer asked Drejaj if he wanted to include anything else did he request political asylum. Moreover, in his interview, Drejaj made no mention of his alleged political activities, membership in the DP, or harm on account of this membership. Third, Drejaj's wife and children departed Albania on October 1, 2000, the same day that Drejaj participated in local elections as a member of the Election Commission for which he was beaten. Drejaj testified that he was planning at the time of his family's departure to join them eventually, revealing that Drejaj's intent to leave Albania arose before the incidents of October 1, 2000, and July 5, 2001.

Further, the IJ found that, even assuming that Drejaj was credible, he had failed to meet his burden with respect to asylum because his testimony was vague,

general, and lacking in specific detail. Notably, the IJ pointed to Drejaj's testimony regarding his participation in the June 24, 2001, riot. Drejaj did not indicate who sponsored the riot, what his role was in the riot, and what conduct he engaged in during the riot. The IJ also pointed to the April 2, 1991, demonstration during which "countless people" were killed or injured. Finally, the IJ noted that Drejaj failed to provide any specifics as to why or how his wife was mistreated to the point she had to leave Albania, or why his wife's father had been arrested and detained for eight years.

The IJ then focused on conditions within Albania. Citing the 2003 Country Report, the IJ noted that: (1) Albania was a republic with a multiparty parliament and that the October local elections were judged to be an improvement over previous elections, with only a few isolated incidents of irregularities and violence; (2) Albania's constitution provided for freedom of assembly, and the government generally respected this practice; (3) although the law required that organizers notify the police about public gatherings, there were no reports that the police arbitrarily refused to permit such gatherings; and (4) the constitution provided Albanians the right to change governments peacefully, and citizens have exercised this right through periodic elections based on universal suffrage.

In conclusion, the IJ found that even if Drejaj's narrative was true, it did not rise to such a level to warrant a finding of past persecution. Moreover, the IJ found

that Drejaj did not sustain his burden of establishing a well-founded fear of future

persecution. The IJ also denied Drejaj relief under the CAT, finding that there was

nothing in the record to indicate that he would be tortured upon his return to

Albania.[3]

**E.     Appeal to the Board of Immigration Appeals ("BIA")**

Drejaj appealed the IJ's decision to the BIA, which adopted and affirmed the

IJ's decision. The BIA also made additional findings. The BIA agreed with the

IJ's enumeration of Drejaj's discrepancies, pointing to Drejaj's failure to detail his

political problems to the INS officer, Drejaj's testimony regarding the October

2000 election incident, and Drejaj's inconsistent testimony concerning the location

of his wife during his alleged arrest in July 2001.

Furthermore, the BIA found that Drejaj failed to meet his burden of proof by

failing to submit readily available corroborating evidence. Specifically, the BIA

noted that Drejaj did not have his cousin — now living in New York and with

whom he was arrested in July 2001 — testify at the hearing or provide an affidavit.

As to why he did not get an affidavit or have his cousin testify, the BIA found

---

[3]The IJ did not expressly order Drejaj removed. "This is because [Drejaj] was referred to the IJ for asylum only proceedings, where, according to agency regulation, the scope of the proceeding is limited exclusively to asylum-related relief, such that the alien cannot contest admissibility, removability, or raise claims concerning his eligibility for other forms of relief. See 8 C.F.R. § 208.2(c)(3)(i) (asylum-only procedures for VWP applicants)." Nreka v. U.S. Att'y Gen., 408 F.3d 1361, 1366 n.5 (11th Cir. 2005).

13

Drejaj's explanation "that he did not think about it" to be unsatisfactory. The BIA also noted that Drejaj's wife did not testify or submit an affidavit, despite the fact she was living with him in the United States.

Drejaj filed a timely petition for review.

## II. STANDARD OF REVIEW

When the BIA issues a decision, we review only that decision, except to the extent that the BIA expressly adopts the IJ's decision. Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001). In this case, the BIA both expressly adopted the IJ's decision and made additional findings. Therefore, we review both the IJ's decision and the BIA's decision.

The IJ's and BIA's factual determinations are reviewed under the substantial evidence test, and this Court should "'affirm the . . . decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1286 (11th Cir. 2005) (citation omitted). Therefore, a finding of fact will be reversed "only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal . . . ." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc), cert. denied, 544 U.S. 1035, 125 S. Ct. 2245 (2005). "Credibility determinations likewise are reviewed under the substantial evidence

14

test." D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 818 (11th Cir. 2004). "The trier of fact must determine credibility, and this court may not substitute its judgment for that of the IJ with respect to credibility findings." Id.

### III. DISCUSSION

An alien is entitled to asylum if he can establish, with specific and credible evidence: (1) past persecution on account of race, religion, nationality, membership in a particular social group, or political opinion; or (2) a "well-founded fear" that his race, religion, nationality, membership in a particular social group, or political opinion will cause future persecution. 8 C.F.R. § 208.13(a), (b); Al Najjar, 257 F.3d at 1287.

"[P]ersecution is an extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation . . . ." Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1231 (11th Cir. 2005) (quotation marks omitted). An asylum applicant may not show merely that he has a political opinion, but must show that he was persecuted because of that opinion. INS v. Elias-Zacarias, 502 U.S. 478, 483, 112 S. Ct. 812, 816 (1992). For a fear to be "well-founded," "an applicant must demonstrate that his or her fear of persecution is subjectively genuine and objectively reasonable." Al Najjar, 257 F.3d at 1289. To establish the necessary causal connection, the alien must present "specific, detailed facts showing a good reason to fear that he or she will be singled out for persecution on account of" a

15

statutorily listed factor.  Sepulveda, 401 F.3d at 1231 (quotation marks and citation omitted).

If an alien is unable to meet the "well-founded fear" standard for asylum, "'he is generally precluded from qualifying for either asylum or withholding of [removal].'"  Al Najjar, 257 F.3d at 1292-93 (citation omitted).  Similarly, the burden on the alien seeking CAT relief is higher than the burden imposed on the asylum seeker.  Id. at 1303.

Although uncorroborated but credible testimony may be sufficient to sustain an applicant's burden of proving eligibility for asylum, "[t]he weaker an applicant's testimony, . . . the greater the need for corroborative evidence."  Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1201 (11th Cir. 2005); see also 8 C.F.R. §§ 208.13(a), 208.16(b).  While "an adverse credibility determination alone may be sufficient to support the denial of an asylum application,"

> an adverse credibility determination does not alleviate the IJ's duty to consider other evidence produced by an asylum applicant.  That is, the IJ must still consider all evidence introduced by the applicant.  If the applicant produces no evidence other than his testimony, an adverse credibility determination is alone sufficient to support the denial of an asylum application.  If, however, the applicant produces other evidence of persecution, whatever form it may take, the IJ must consider that evidence, and it is not sufficient for the IJ to rely solely on an adverse credibility determination in those instances.  Further, the IJ must offer specific, cogent reasons for an adverse credibility finding.

Forgue, 401 F.3d at 1287.

16

"Once an adverse credibility finding is made, the burden is on the applicant alien to show that the IJ's credibility decision was not supported by specific, cogent reasons or was not based on substantial evidence."  Id. (quotation marks and citations omitted).  "A credibility determination, like any fact finding, may not be overturned unless the record compels it."  Id. (quotation marks and citations omitted).

Substantial evidence supports the IJ's and BIA's conclusions that Drejaj's testimony was not credible.  A careful comparison between Drejaj's testimony, his asylum application, and his sworn statement to the INS officer reveals several material inconsistencies, including: (1) Drejaj failed to include his July 5, 2001, arrest in either his sworn statement or written asylum application and failed to provide an adequate explanation for the omission, admitting on cross-examination that he had left it out for "no particular reason"; (2) Drejaj gave inconsistent, conflicting testimony regarding the police beatings of October 2000, first testifying that members of other parties were beaten, only to claim later that just members of the DP were beaten; (3) Drejaj was planning to leave Albania with his family before the events of October 1, 2000, and July 5, 2001; and (4) Drejaj failed to mention any acts of political persecution or his DP membership during his initial INS interview, instead claiming that he was entering the country because he feared for his family's safety because of "a mafia group or criminals on the street."

17

See Dailide v. U.S. Att'y Gen., 387 F.3d 1335, 1343 (11th Cir. 2004) (inconsistencies between applicant's testimony and other record evidence supports adverse credibility finding). These inconsistencies were cited by the IJ and the BIA and are "specific, cogent reasons" for the adverse credibility finding and are supported by the record. Forgue, 401 F.3d at 1287 (quotation marks and citations omitted).[4]

Also telling with regard to Drejaj's credibility is the Asylum Profile, which stated that claims by Albanian nationals based on political grounds are likely to be incredible, and that such claims are usually amplified by the assertion that a reconstituted Communist regime has come to power. This is essentially the claim Drejaj makes in his asylum application. Indeed, the Asylum Profile cautions adjudicators to examine closely claims such as Drejaj's and explore other

---

[4]Although we have not directly addressed the issue, two circuits indicate that an adverse credibility determination based on inconsistencies must involve inconsistencies relating to the basis of the alleged fear of persecution (i.e., "the heart of the asylum claim") and that minor inconsistencies about collateral matters or unimportant facts will not support an adverse credibility finding. See Gao v. Ashcroft, 299 F.3d 266, 272 (3d Cir. 2002); Chebchoub v. INS, 257 F.3d 1038, 1043 (9th Cir. 2001). However, neither circuit cites any statute or regulation for this demarcation in credibility determinations. In non-immigration cases, this circuit has not required a witness's inconsistent testimony to relate to the heart of the claim before the factfinder can disbelieve that witness. See, e.g., Conroy v. Abraham Chevrolet-Tampa, Inc., 375 F.3d 1228, 1231 (11th Cir. 2004). However, we need not resolve this issue because Drejaj's inconsistencies are material and relate to the basis of his alleged fear of prosecution.

Further, the REAL ID Act of 2005, among other things, expressly permits an adverse credibility finding based on inconsistencies "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim . . . ." See Pub. L. No. 109-13, § 101(a)(3), 119 Stat. 231, 303 (codified at 8 U.S.C. § 1158(b)(1)(B)(iii)). Because Drejaj's asylum application was filed before May 11, 2005, the date the REAL ID Act was enacted, this provision does not apply to his claim. Id. § 101(h)(2), 119 Stat. 231, 305.

motivations the claimant may have, including family members already present in the United States. Drejaj's wife and children, as well as his cousin, who was allegedly arrested and beaten with Drejaj in Albania, reside in the United States, but none of them testified or provided corroborating affidavits. Drejaj's concession that he intended to leave Albania in October 2000 with his wife and children, but instead chose to remain and participate in the election, also undermines his credibility and claims of persecution.

Although, as discussed above, "an adverse credibility determination does not alleviate the IJ's duty to consider other evidence produced by an asylum applicant," Forgue, 401 F.3d at 1287, the IJ's decision does not reflect that he relied solely on the adverse credibility determination. For example, the IJ explicitly stated in his decision that the record contained the 2003 Country Report for Albania, along with explaining that this document advised the IJ on the political conditions in Albania at the time. The IJ also discussed the Asylum Profile.

In addition, to the extent Drejaj submitted into evidence (1) a letter from the PAA detailing Drejaj's mistreatment at the hands of the Communist state security force; and (2) a letter from the Chairman for District Kelmend, stating that Drejaj had been targeted by the police for his political activities, the fact that this evidence also may support a conclusion contrary to the administrative findings is not enough

19

to justify a reversal. See Adefemi, 386 F.3d at 1027. Thus, the IJ's reasons for his adverse credibility determination are supported by substantial evidence, and nothing in the record compels us to substitute our judgment for that of the IJ regarding credibility. See D-Muhumed, 388 F.3d at 818.

Accordingly, substantial evidence supports the IJ's and BIA's determination that Drejaj failed to establish his eligibility for asylum. See Forgue, 401 F.3d at 1287. Because Drejaj failed to establish his eligibility for asylum, he likewise has failed to establish eligibility for withholding of removal and relief under the CAT. See Al Najjar, 257 F.3d at 1292-93, 1303.

## IV. CONCLUSION

For the above reasons, we deny Drejaj's petition for review.

**PETITION DENIED.**