[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCT 31, 2008
THOMAS K. KAHN
CLERK

_____

No. 08-10388
Non-Argument Calendar

_____

Agency No. A70-071-783

XING LIN,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(October 31, 2008)**

Before BIRCH, MARCUS and WILSON, Circuit Judges.

PER CURIAM:

Xing Lin, a native and citizen of China, petitions us for review of the Board

of Immigrations Appeals' ("BIA") decision affirming the Immigration Judge's

("IJ") removal order and denial of asylum, withholding of removal under the

Immigration and Nationality Act ("INA")[1], and relief under the United Nations

Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or

Punishment ("CAT"). The BIA concluded that Lin's testimony was not credible

and that he had failed to establish eligibility for the requested forms of relief.

Because Lin's only claims before the BIA concerned the IJ's denial of his asylum

application and a motion to remand, we lack jurisdiction to consider his arguments

for withholding of removal and CAT relief. Accordingly, we DISMISS Lin's

petitions for withholding of removal and CAT relief and DENY Lin's petition for

asylum.

## I. BACKGROUND

A. Lin's 2001 Asylum Application

Lin is a native and citizen of the People's Republic of China who entered the

United States through Los Angeles in 1990. Administrative Record at 817.

Because he lacked a valid entry document, he was briefly detained and ordered to

---

[1] Lin's case predates the Illegal Immigration Reform and Immigration Responsibility Act ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009 (1996), which renamed deportation and exclusion proceedings as removal proceedings. In this case, we employ the post-IIRIRA term "withholding of removal" as that term is used by the parties and there is no functional difference between the terms.

2

appear at a hearing before an IJ to determine his immigration status. Id. at 1509-10. Lin failed to appear for the hearing and was ordered removed in absentia in 1991. Id. at 1394-95. In 2000, Lin filed a motion to reopen the proceedings, alleging that he did not receive notice of the 1991 hearing. Id. at 1386-87. The IJ granted the motion to reopen, and a new hearing date was set. Id. at 1380.

In February 2001, Lin filed an application for cancellation of removal, seeking asylum, withholding of removal, and relief under CAT. Id. at 1117-34. He claimed that he would be persecuted in China under the country's birth control policy. Id. at 1130. Lin attached an affidavit to his application in which he provided a brief personal narrative. Id. at 1137. Lin stated that he was born and previously resided in Fujian Province, China, and that he married his wife, Bi Xian Zheng ("Zheng"), in 1988. He registered his marriage with the government in 1989. After her first child was born, Zheng was forced to have an intrauterine device ("IUD") implanted by Chinese family planning officials. She later had the device removed by a private physician due to pain and discomfort. Soon thereafter, Zheng became pregnant with the couple's second child. Lin stated that he left China for the United States in October 1990, shortly after his wife became pregnant. Id.

Mindful that her second pregnancy was in violation of China's birth control policy, Zheng went into hiding from family planning officials. Government

3

officials soon learned of the pregnancy and arrested Lin's mother when she refused to divulge Zheng's location. Zheng gave birth to the child in secret and a large fine was imposed on her for violating China's family planning laws. Id.

Lin stated that he divorced Zheng in 1994. Four years later, he reconciled with her after she arrived in the United States with her son. Lin and Zheng then had a third child together in the United States. Lin stated that, if forced to return to China, he or his wife would be sterilized, and they wanted to have more children. Id.

Lin attached a copy of an article by Dr. John Aird, an expert on China's family planning laws, to his February 2001 affidavit. Id. at 1232-48. The article described the coercive aspects of China's one-child policy and concluded that China maintained its coercive birth control tactics despite stories to the contrary. Id. at 1235-48. Also attached was a transcript from a 1998 Nightline television broadcast in which former Chinese officials and China experts discussed forced sterilizations and abortions in the country. Id. at 1249-57.

1. Lin's 2003 Supplement

In May 2003, Lin supplemented his application and included the asylum applications of his wife and son. Id. at 817-37. He also filed a supplemental affidavit in which he largely reiterated his previous statements. Id. at 840-43. Lin did state for the first time in his supplemental affidavit that his wife was forced to

4

undergo an abortion in China when she became pregnant after the couple's first child.  Id. at 840.  Lin also explained that his wife was forced to pay three separate fines after their second child was born: one to obtain her mother-in-law's release from custody, one to pay for the second child's registration with the government, and one for her refusal to identify the doctor who delivered their second child.  Id. at 842.

Lin's supplemental asylum application also included an affidavit from Zheng which largely matched Lin's statements regarding their dealings with family planning officials in China.  Id. at 848-51.  In addition, Lin included a note from his son that stated that he would experience hardships if he and his family were forced to return to China as he does not read or write Chinese characters.  Id. at 858-60.  Finally, Lin attached several documents to his supplemental affidavit, including a "Planned Birth Control Operation Certificate" from a Chinese hospital which indicated that Zheng had a midterm induced abortion.  Id. at 910.

2.  Department of Homeland Security ("DHS") Documents

In response, DHS filed the following documents related to Zheng's immigration proceedings: (1) Zheng's asylum application; (2) the transcript from Zheng's asylum hearing; (3) a DHS forensic report; and (4) the 2004 State Department Country Report.  Id. at 696-1434.

5

a. IJ's Decision Regarding Zheng's Asylum Application

In her asylum application, Zheng contended that she was forced to have an abortion and was forced to submit a bond to ensure her return for sterilization in the future. Id. at 706-07. The IJ denied Zheng's application for asylum, withholding of removal, and CAT relief, finding that her testimony was not credible because her claim to a forced abortion was contradicted by a State Department Report that indicated certificates of abortion were only issued if the abortion was voluntary. Id. at 724-25. The IJ also noted that the State Department indicated that there were no forced abortions in the Fujian province and that birth control laws were not aggressively enforced there. Id. at 725-26. The IJ also questioned the authenticity of the documentary evidence submitted. Id. at 728-29. The IJ further found that Zheng failed to establish past persecution or a well-founded fear of future persecution. Id. at 728-30.

b. Zheng's Asylum Hearing Transcript

Also included in the government documentation was the transcript from Zheng's January 2000 asylum hearing. Id. at 738-814. During Zheng's hearing, the DHS objected to the authenticity of Chinese documents submitted by Zheng on grounds that they could not be verified. Id. at 758. Zheng testified that though she was then divorced from Lin, she continued to live with him in the United States. Id. at 762-63. She testified to having three children, one who was born in the

6

United States, one born in China who was in the United States, and one that was born and resided in China. Id. at 764. Zheng stated that she had her first child at age twenty-two before China enacted regulations requiring that women wait until they were twenty-five. Id. at 770. She claimed that she was married at the time to Lin though the couple had not yet registered their marriage. Id.

She stated that twenty days after giving birth to her first child she became pregnant again. Id. at 771. The pregnancy was discovered when she was taken to a hospital to have an IUD implanted. Id. at 771-72. Zheng testified that she was three months pregnant when she was taken to a hospital and forced to have an abortion. Id. at 771-73. When she became pregnant a third time with her second child, Zheng claimed that she hid from family planning officials at her brother's house and her mother was arrested for not disclosing where she was. Id. at 777. After giving birth in secret at her brother's house, she was visited by family planning officials and forced to pay a large fine. Id. Zheng stated that she was taken to be sterilized after giving birth to the second child but convinced officials not to go through with the procedure because her husband was out of the country. She then posted a bond to ensure she would not give birth again. Id. at 779-80.

c. DHS Forensic Document Laboratory Report

The government also filed a report from DHS's Forensic Document Laboratory which examined the Chinese documents submitted by Lin and

concluded they could not be authenticated.  Id. at 1408.  The laboratory noted that based on the fee-for-service nature of the Chinese notarial system, documents such as the birth certificates and payment receipts had limited value without the primary evidence from which the documents were based.  Id. at 1409.

### d.  2004 State Department Country Report

Finally, the government submitted a 2004 State Department Country Report which stated that Chinese documents were subject to widespread fraud and fabrication, particularly documents related to birth and birth control measures.  Id. at 1438.  The report noted significant problems with notarial documents originating in the Fujian province as well.  Id.  The report also underscored the lack of evidence of forced abortions or sterilizations occurring in the Fujian province in the previous ten years, apart from isolated incidents in the 1980s and early 1990s. Id. at 1434.

## B.  Lin's 2003 Hearing Before the IJ

Lin's testimony before the IJ largely tracked the information that he provided in his supplemental affidavit, with a few notable additions.  Lin testified that he was twenty-four when he married Zheng.  He also fleshed out his rationale for divorcing his wife, claiming that he did so in order to enable her to attempt a sham marriage with a U.S. citizen to gain entry into the United States.  Id. at 176.

8

In addition to his testimony, several exhibits were introduced at the hearing, including the 1998 and 2002 State Department Country Reports for China. Id. at 220-321. Also included was an affidavit from Dr. Aird which outlined instances of forced abortion and sterilization in China and criticized the holdings of the IJ in Zheng's asylum case. Id. at 324-71. Attached to the affidavit were numerous exhibits cited by Dr. Aird in his affidavit. Id. at 425-682. In addition, Lin entered into evidence an affidavit from Dr. Jacques deLisle, a professor at the University of Pennsylvania Law School, stating that the Chinese documents submitted by Lin appeared to be authentic. Id. at 685-91.

The IJ did not make a decision at the time of the hearing so that she could review the extensive documentary evidence. Id. at 81. The IJ then denied Lin's application in a written decision, finding that Lin's testimony in support of his application was not credible. Id. at 77-101. The IJ noted that Lin testified that Zheng became pregnant in October 1989 after giving birth on 15 September 1989 and then became pregnant again in July 1990 after her IUD was removed in June 1990. While stating that it was "not out of the realm of medical possibility," the IJ found it unlikely that Zheng could become pregnant six weeks after giving birth and one month after having her IUD removed. Id. at 92. In addition, the IJ noted that Lin testified that family planning officials would arrest or forcibly sterilize

9

women who missed IUD appointments, however, Lin's wife missed more than three appointments and was only levied a fine.

The IJ also noted inconsistencies between Lin's testimony and that of Zheng. Lin testified that he married Zheng when he was twenty-four years old, while she testified that they were twenty-two. In addition, Lin testified that Zheng became pregnant six weeks after giving birth whereas she testified that she conceived after only twenty days. Id. at 92-93.

With regard to the corroborating documentation, the IJ noted that such documentation was tainted by reports of widespread fraud and fabrication in China and consequently assigned the documents limited value. In addition, the IJ noted that Zheng's abortion certificate listed a midterm abortion but that Lin had testified his wife was two months pregnant at the time of the abortion. The IJ rejected Lin's testimony that the time discrepancy was the result of a clerical error. Id. at 93-95.

The IJ then denied Lin's asylum claim, finding Lin had not provided sufficient evidence that he or his wife suffered past prosecution or that they had a credible fear of future prosecution. Specifically, the IJ found that Lin could not show past persecution because his account of the forced abortion was incredible and the record was otherwise devoid of any other evidence of past persecution. Lin did not show a subjectively genuine fear of future persecution based on the fact that he was not credible. Additionally, he did not show an objectively reasonable

10

fear of future persecution because his fear of being forcibly sterilized was not supported by the documentary evidence.

The IJ found that if Lin could not meet the standard for asylum, he could not meet the higher standard for withholding. The IJ also denied relief under CAT, finding that Lin's testimony was not credible and that Lin could safely relocate internally in China.

## C.  Lin's Appeal to the BIA

Lin appealed to the BIA and also moved for the case to be remanded to the IJ for further proceedings. In his notice of appeal, Lin alleged that the IJ erred in discrediting his testimony based on minor inconsistences and speculation. In his brief to the BIA, Lin contended that the IJ erred by rejecting all the documentary evidence without making a ruling as to the authenticity of specific documents. Id. at 11-12. With regard to the abortion certificate, Lin claimed that the IJ should not have rejected it as he had adequately explained that the reference to a midterm abortion was a clerical error that the hospital refused to correct. Id. at 12.

Lin also alleged that he had established eligibility for asylum relief based on past persecution by providing extensive documentary evidence and detailed personal testimony. He also claimed that he had established a well-founded fear of future persecution, noting that he provided evidence that foreign-born children to Chinese nationals were treated as Chinese citizens and that there was an official

11

policy of forced sterilization in Fujian Province for those returning to China who have more than one child. Id. at 13-14.

The BIA affirmed the IJ's decision. The BIA noted that the IJ found a series of reasons to be suspicious of Lin's claim of persecution. Id. at 2-3. The BIA found that while no single reason would lead to a conclusion that Lin's story was untrue, the "accumulated effect" of the issues led to a conclusion that Lin failed to meet his burden of proof. Id. at 2. The BIA discounted Lin's argument that the IJ improperly rejected the documentary evidence, finding that the IJ's decision was proper considering the record as a whole. The BIA found that "[i]nasmuch as the applicant did not credibly testify," there was no basis to overturn the IJ's decision. Id. The BIA also rejected Lin's motion to remand, finding that the factors for granting remand did not warrant a granting of the motion in this case.

Lin makes three arguments in support of his appeal. First, the BIA erred in upholding the IJ's adverse credibility determination. Second, the IJ improperly rejected the bulk of Lin's documentary evidence. Third, the IJ erred in denying Lin's application for asylum, withholding of removal, and relief under CAT. We address each argument in turn.

## II. DISCUSSION

A. <u>Whether Substantial Evidence Supports the IJ's Adverse Credibility Determination</u>

Lin argues that the BIA erred in upholding the IJ's adverse credibility determination because it was not supported by substantial evidence and was based on mischaracterizations of Lin's testimony, the IJ's speculation and conjecture, and the improper rejection of supporting documents. Furthermore, Lin argues that the IJ erred in finding inconsistencies in his testimony because he adequately explained any discrepancies.

We "review only the [BIA's] decision, except to the extent that it expressly adopts the IJ's opinion." <u>Al Najjar v. Ashcroft</u>, 257 F.3d 1262, 1284 (11th Cir. 2001). "Insofar as the [BIA] adopts the IJ's reasoning, we will review the IJ's decision as well." <u>Id.</u> In this case, we will only review the BIA's decision except to the extent it refers to the reasoning of the IJ.

"To the extent that the BIA's decision was based on a legal determination, [our] review is <u>de</u> <u>novo</u>." <u>D-Muhumed v. U.S. Att'y Gen.</u>, 388 F.3d 814, 817 (11th Cir. 2004). Factual determinations, however, are reviewed under the substantial evidence test, which requires that "we view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." <u>Adefemi v. Ashcroft</u>, 386 F.3d 1022, 1027 (11th Cir. 2004) (<u>en</u>

13

banc). We "must affirm the BIA's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." D-Muhumed, 388 F.3d at 818 (quotation marks omitted).

We review credibility determinations under the substantial evidence test as well and we "may not substitute [our] judgment for that of the BIA with respect to credibility findings." Id. The IJ must make "clean" credibility determinations. Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1201 (11th Cir. 2005) (quotation marks omitted).

> [T]he IJ [or BIA] must offer specific, cogent reasons for an adverse credibility finding. Once an adverse credibility finding is made, the burden is on the applicant alien to show that the IJ's [or BIA's] credibility decision was not supported by specific, cogent reasons or was not based on substantial evidence. A credibility determination, like any fact finding, may not be overturned unless the record compels it.

Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1287 (11th Cir. 2005) (citations and quotation marks omitted).

"Indications of reliable testimony include consistency on direct examination, consistency with the written application, and the absence of embellishments." Ruiz v. U.S. Att'y Gen., 440 F.3d 1247, 1255 (11th Cir. 2006). If credible, an alien's testimony may be sufficient, without corroboration, to sustain his burden of proof in establishing his eligibility for relief from removal. Forgue, 401 F.3d at

14

1287. "Conversely, an adverse credibility determination alone may be sufficient to support the denial of an asylum application." Id. However, if an applicant produces evidence other than his testimony, "it is not sufficient for the IJ to rely solely on an adverse credibility determination in those instances." Id. "The weaker an applicant's testimony, however, the greater the need for corroborative evidence." Yang, 418 F.3d at 1201.

Much of the IJ's adverse credibility determination hinges on seemingly minor inconsistencies.[2] Although many of our sister circuits have held that in order to support an adverse credibility finding, such inconsistencies must go to the "heart of the asylum claim" to be sufficient grounds for such a finding, we have yet to adopt the "heart of the claim" test in a published opinion.[3] See, e.g., Gao v. Ashcroft, 299 F.3d 266, 272 (3d Cir. 2002); Chebchoub v. I.N.S., 257 F.3d 1038, 1043 (9th Cir. 2001). The IJ's adverse credibility determination regarding Lin's claim that his wife was forced to have an abortion was supported by substantial

---

[2] We do not apply the "totality of the circumstances" test regarding credibility determinations as set out in 8 U.S.C. § 1158(b)(1)(B)(iii) as Lin's asylum application predates passage of that amended portion of the law.

[3] We have, however, addressed the test in our nonprecedential, unpublished opinions. In Thamsir v. United States Attorney General, we stated that inconsistencies must go to the heart of a petitioner's claim in order for an IJ or the BIA to find an alien not credible. Thamsir v. U.S. Att'y Gen., 167 Fed.Appx. 788, 790 (11th Cir. 2006) (per curiam). Conversely, in Drejaj v. United States Attorney General, we questioned the "heart of the claim" test because there is no statutory or regulatory basis for it. Drejaj v. U.S. Att'y Gen., 192 Fed.Appx. 847, 854 n.4 (11th Cir. 2006) (per curiam).

15

evidence. The record contains several inconsistencies between Lin's testimony, Zheng's testimony, and the abortion certificate submitted as evidence of the abortion. Lin testified that his wife became pregnant six weeks after giving birth to their first child. Zheng testified it was only twenty days. Lin testified that his wife was two months pregnant when the abortion occurred. Zheng testified that she was three months pregnant. Lin testified that the abortion certificate submitted into evidence had a clerical error as his wife did not receive a midterm abortion. Zheng testified that the document evidenced her midterm abortion and did not testify that the document was in error. Lin testified that his wife was forced to have an abortion but the abortion certificate indicated that the abortion was "planned." Administrative Record at 910. Perhaps most tellingly, Lin never mentioned his wife's alleged forced abortion in his original 2001 asylum application. Given these discrepancies, substantial evidence supported the IJ's adverse credibility finding regarding Lin's claim that his wife had a forced abortion.

Substantial evidence also supported the adverse credibility finding as to Lin's testimony that he or his wife would be persecuted if returned to China. There are several discrepancies between Lin and Zheng's testimony regarding the circumstances surrounding the birth of their second child. Lin testified that his wife hid from family planning officials at his aunt's house where his second child was born. Zheng testified that she hid at her brother's house. Lin testified that his

16

mother was arrested when she would not disclose where his wife was hiding whereas Zheng testified that her own mother was arrested. Lin and Zheng testified that they feared sterilization if returned to China, but both also testified that Zheng received only a fine for violating China's family planning law. In addition, both Lin and Zheng testified that government officials allowed families to have more than one child in their region. Given these discrepancies, substantial evidence supported the IJ's adverse credibility finding with regard to Lin's testimony regarding the response of government officials after the birth of their second child.

The IJ was free to reject Lin's explanations of the discrepancies in his testimony. Lin argues that the IJ erroneously discredited his testimony given that he explained many of the inconsistences. For example, he testified that the abortion certificate contained a clerical error the hospital refused to correct, Zheng was fined instead of sterilized because he was outside of the country, he simply miscalculated his age of marriage, and his wife refers to her mother-in-law as "mother." Credibility determinations are left to the IJ and BIA. We can only overturn them if the record compels it, and here it does not.

Finally, Lin asserts that the IJ erred in finding that it was implausible that his wife could get pregnant six weeks after giving birth and pregnant one month after having her IUD removed. Lin is correct in arguing that this finding is not supported by substantial evidence in the record. There is no medical evidence

17

included in the record which would support the IJ's finding that the pregnancies were unlikely to have occurred when Lin testified. Lin argues that if any reason cited by the IJ for finding Lin's testimony incredible is determined to be erroneous, we must reverse the IJ's entire credibility determination. However, Lin cites no case law in support of this proposition. Because the bulk of the IJ's findings were supported by substantial evidence in the record, the fact that one of the IJ's conclusions was incorrect does not compel us to overturn the entirety of the IJ's credibility determination. Because the BIA and IJ offered specific, cogent reasons for the adverse credibility finding and the finding is supported by substantial evidence in the record, we conclude that the BIA did not err in affirming the IJ's adverse credibility determination.

B. Whether the IJ Erred in Rejecting Lin's Documentary Evidence

Lin argues that the BIA erred in affirming the IJ's decision because the IJ improperly rejected much of the documentation he submitted as evidence simply because the documents were products of the Chinese notarial system. He also contends that there is no evidence that the IJ or BIA considered the documentary evidence he submitted regarding conditions in China and instead overly relied on the State Department Country Report.

As previously discussed, we review factual determinations under the substantial evidence test, which requires that "we view the record evidence in the

18

light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." Adefemi, 386 F.3d at 1027. We "must affirm the BIA's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." D-Muhumed, 388 F.3d at 818 (quotation marks omitted). We have held that the BIA and IJ are entitled to rely heavily on the State Department Country Reports. Djonda v. U.S. Att'y Gen., 514 F.3d 1168, 1175 (11th Cir. 2008). In addition, "the substantial evidence test does not allow us to reweigh . . . from scratch the importance to be placed on the [Country] Report." Id. (quotation marks and citation omitted).

The IJ's treatment of the documentary evidence is supported by substantial evidence. The IJ did not reject the documentary evidence as Lin argues but instead gave it limited weight. First, Lin challenges the limited value the IJ placed on the certificate of abortion he submitted as proof his wife received a forced abortion. As discussed above, portions of the abortion certificate were inconsistent with Lin's testimony. For example, Lin testified his wife was two months pregnant when the abortion occurred and the certificate stated it was a midterm abortion. In addition, the government provided a State Department Report, which indicated widespread fraud and fabrication in such documents, especially those from the Fujian province. Also, the government could not verify the authenticity of the document and noted the limited value of documents obtained from China's fee-for-

19

service notarial system. Based on this record, substantial evidence supported the IJ's decision to give the abortion certificate limited value.

Second, the IJ did not err in giving limited weight to the additional documents submitted from China. As discussed, the government submitted evidence of the unreliability of documents procured through the Chinese notarial system. As such, there was evidence in the record to support the IJ's decision to give these documents limited weight. Moreover, the IJ did not reject the factual propositions underlying the bulk of Lin's documentary evidence. The documents at issue consisted of Lin's marriage certificates, his children's birth certificates, and documents related to the fines paid for violating family planning laws. There is no indication that the IJ rejected Lin's claim to being married to Zheng, to having fathered three children, or that Zheng was fined for violating family planning laws.

Finally, the IJ reviewed the additional documentary evidence submitted by Lin and did not err by overly relying on the State Department Country Report. While the IJ did not discuss each document submitted by Lin in her report, the IJ specifically allocated herself additional time to complete her written report noting the "extensive documentation submitted in support of Lin's claim." Administrative Record at 81. Because the IJ specifically delayed issuing her

20

decision in order to review the documentary evidence, Lin's contention that the IJ

ignored this evidence is without merit.

C.  Whether the IJ Erred in Denying Lin's Application for Asylum, Withholding of
Removal, and Relief under the CAT

Lin contends that the BIA and IJ erred in determining he was ineligible for

asylum, withholding of removal, or CAT relief.  He argues that he established past

persecution because his wife was forced to undergo an abortion.  In addition, he

argues that he established a well-founded fear of future persecution because he is

likely to be sterilized upon his return to China based on his violation of China's

one-child policy.

An alien who arrives in, or is present in, the United States may apply for

asylum.  See INA § 208(a)(1), 8 U.S.C. § 1158(a)(1)(2007).  The Secretary of the

Department of Homeland Security or the Attorney General has discretion to grant

asylum if the alien meets the INA's definition of a "refugee."  See INA

§ 208(b)(1), 8 U.S.C. § 1158(b)(1).  A "refugee" is defined as:

> any person who is outside any country of such person's nationality or,
> in the case of a person having no nationality, is outside any country in
> which such person last habitually resided, and who is unable or
> unwilling to return to, and is unable or unwilling to avail himself or
> herself of the protection of, that country because of persecution or a
> well-founded fear of persecution on account of race, religion,
> nationality, membership in a particular social group, or political
> opinion . . . .

21

INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A)(2007). "The asylum applicant carries the burden of proving statutory 'refugee' status." D-Muhumed, 388 F.3d at 818.

To establish asylum eligibility, the petitioner must, with specific and credible evidence, demonstrate (1) past persecution on account of a statutorily listed factor, or (2) a "well-founded fear" that the statutorily listed factor will cause future persecution. 8 C.F.R. § 208.13(a), (b); Al Najjar, 257 F.3d at 1289. "To establish asylum based on past persecution, the applicant must prove (1) that [he] was persecuted, and (2) that the persecution was on account of a protected ground." Silva v. U.S. Att'y Gen., 448 F.3d 1229, 1236 (11th Cir. 2006).

If he cannot show past persecution, the petitioner must demonstrate a well-founded fear of future persecution that is both (1) subjectively genuine and objectively reasonable, and (2) on account of a protected ground. Id. The subjective component can be proven "by the applicant's credible testimony that he or she genuinely fears persecution," while the objective component "can be fulfilled either by establishing past persecution or that he or she has a good reason to fear future persecution." Al Najjar, 257 F.3d at 1289 (quotation marks omitted).

Furthermore, the petitioner's well-founded fear of persecution must be on account of, or because of, one of the statutorily listed factors. See INS v. Elias-Zacarias, 502 U.S. 478, 483, 112 S. Ct. 812, 816 (1992). The petitioner must

22

establish this causal connection by "presenting specific, detailed facts showing a good reason to fear that he or she will be <u>singled out</u> for persecution" on account of the statutory factor. <u>Sepulveda v. U.S. Att'y Gen.</u>, 401 F.3d 1226, 1231 (11th Cir. 2005) (per curiam) (quotation marks omitted). However, the alien does not need to prove that he or she would be singled out for persecution if (1) there is a "pattern or practice" of persecution against similarly situated individuals and (2) the alien establishes his inclusion within that group of individuals such that his fear of persecution upon return is reasonable. <u>See</u> 8 C.F.R. 208.13(b)(2)(C)(iii)(A), (B).

Neither the INA nor the regulations define "persecution." We have stated, however, that "persecution is an extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation, and . . . mere harassment does not amount to persecution." <u>Sepulveda</u>, 401 F.3d at 1231 (quotation marks and internal alterations omitted). The "cumulative effect" of the alleged incidents of persecution must amount to past persecution or a well-founded fear of future persecution. <u>Delgado v. U.S. Att'y Gen.</u>, 487 F.3d 855, 861-62 (11th Cir. 2007) (per curiam).

We generally lack jurisdiction to consider claims raised in a petition for review where the petitioner did not exhaust his administrative remedies. <u>See</u> <u>Amaya-Artunduaga v. U.S. Att'y Gen.</u>, 463 F.3d 1247, 1250-51 (11th Cir. 2006) (per curiam). Therefore, we lack jurisdiction to hear arguments on appeal that

23

were not raised before the BIA because the petitioner has not exhausted his administrative remedies. See Alim v. Gonzales, 446 F.3d 1239, 1253 (11th Cir. 2006).

Because Lin did not challenge the denial of his claims to withholding of removal and CAT relief before the BIA, he failed to exhaust his administrative remedies and we lack jurisdiction to consider those arguments. In addition, Lin failed to challenge the BIA's denial of his motion to remand in his initial brief, and so has abandoned that issue. Al Najjar, 257 F.3d at 1283 n.12.

Lin argued before the BIA that the IJ erred in denying his claim for asylum because his testimony and the documentary evidence established that his wife had suffered past persecution, and that he and his wife had a well-founded fear that if they returned to China they would be sterilized. Because Lin exhausted administrative review of his claim for asylum, we may consider it.

The BIA did not err in affirming the IJ's decision that Lin failed to establish past persecution. The record supports the IJ's finding that Lin's testimony that his wife was forced to have abortion was not credible, and the IJ properly gave limited weight to the abortion certificate submitted by Lin. Because Lin did not provide any additional evidence in support of his claim, the IJ correctly found that Lin failed to meet his burden of establishing that he or his wife suffered past persecution by being forced to have an abortion.

24

While the arrest of Lin's mother might support a claim of past persecution, Lin did not raise this issue with the BIA or argue it in his initial brief. As such, Lin has abandoned the issue, and we lack jurisdiction to consider it. Alim, 446 F.3d at 1253; Al Najjar, 257 F.3d at 1282 n.12. Lin also failed to present evidence of any other instance of possible past persecution. Thus, he failed to show he suffered past persecution.

The BIA did not err in affirming the IJ's decision that Lin failed to establish a well-founded fear of future persecution. As discussed, Lin testified that his wife received a fine after the birth of their second child in violation of China's family planning laws. Also, both Lin and Zheng testified that couples were allowed to have more than one child in their region. In addition, as noted above, the IJ did not err in relying on the State Department Country Report for China, which stated that coercive techniques have not been employed to enforce family planning laws in Fujian Province since the early 1990s. Because Lin's wife was not previously subjected to coercive techniques and the Country Report indicated those techniques are not used, the BIA did not err in finding that Lin failed to establish a well-founded fear of future persecution as he failed to show a subjectively genuine or objectively reasonable fear of future persecution. See Silva, 448 F.3d at 1236.

### III. CONCLUSION

Lin petitions us for review of the BIA's decision affirming the IJ's removal order and denial of asylum, withholding of removal, and relief under the CAT. We concur with the BIA and conclude that Lin's testimony was not credible and that he had not met his burden of proof to establish eligibility for asylum. Because Lin's only claims before the BIA concerned the IJ's denial of his asylum application and a motion to remand, we lack jurisdiction to consider his arguments for withholding of removal and CAT relief. Accordingly, we DISMISS Lin's petitions for withholding of removal and CAT relief and DENY Lin's petition for asylum.

**PETITION DISMISSED, in part, and DENIED, in part.**